# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: July 25, 2025

| | |
|---|---|
| * * * * * * * * * * * * <br> SCOTT EVERHART,              * <br>                                    * <br>      Petitioner,               * <br>                                    * <br> v.                                     * <br>                                    * <br> SECRETARY OF HEALTH     * <br> AND HUMAN SERVICES,      * <br>                                    * <br>      Respondent.            * <br> * * * * * * * * * * * * | No. 19-275V <br><br> Special Master Gowen |

*Michael P. Milmoe*, Law Offices of Leah V. Durant, LLC, Washington, D.C., for petitioner
*Michael Bliley*, United States Department of Justice, Washington, D.C., for respondent

### DECISION ON DAMAGES[1]

     I.     **Procedural and Factual History**

Entitlement in this case was resolved in the Vaccine Program's Special Processing Unit. A Ruling on Entitlement finding that petitioner was entitled to compensation was issued by Chief Special Master Corcoran on April 15, 2020 after respondent conceded entitlement in his Rule 4(c) Report. Ruling on Entitlement at 2 (ECF No. 20); Rule 4(c) Rept. at 9 (ECF No. 17).

On April 13, 2020, Respondent filed his Rule 4(c) report in which he conceded that petitioner satisfied the criteria to establish a Table SIRVA claim resulting from the TDAP vaccination he received on November 2, 2017 and is entitled to compensation. Rule 4(c) Rept. at 1, 9. Specifically, respondent agreed that "petitioner has satisfied the criteria set forth in the Vaccine Injury Table (Table) and the Qualifications and Aids to Interpretation (QAI); petitioner had no history of pain, inflammation or dysfunction in his left shoulder; his pain and reduced range of motion occurred within 48 hours of receipt of an intramuscular vaccination; his symptoms were limited to the shoulder in which the vaccine was administered; and no other condition or abnormality was identified to explain his symptoms." Ruling on Entitlement.

---

[1] Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this decision on the website of the United States Court of Federal Claims, with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that include medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18 (b).

The case was reassigned to my docket after the parties were unable to resolve damages informally. After many rounds of unsuccessful settlement negotiations and status conferences, a damages hearing was set for and held in Washington, D.C. on January 22 and 23, 2025. At the hearing, petitioner presented extensive testimony explaining the nature of his injury, the effect of his injury on his life, and the resulting impairment to his earning capacity.

Prior to the hearing, petitioner filed expert reports from several experts to prove his damages claims. He filed two statements from his treating orthopedic surgeon, Dr. Matthew Provencher, which explained why petitioner's pain has continued and the limitations caused by his condition. Petitioner also filed vocational reports from two vocationalists, Roberta Hurley, who filed two reports, and Dr. Staci Schonbrun, who filed one report. Finally, petitioner filed an economic expert report from Dr. Robert Cook to present his opinion and calculations necessary to come to a conclusion about the net present value of petitioner's future wage loss claim. Each of these experts testified at the hearing. Respondent filed two rebuttal reports from vocationalist Trey Moseley, who also testified at the hearing about Mr. Everhart's residual vocational capacity.

In addition to the above listed experts, petitioner testified on his own behalf at the hearing. Other fact witnesses included petitioner's wife, petitioner's father-in-law, Robert Warner, his wife's aunt, Susan McEwen, who is a nurse practitioner and assisted in his care, and petitioner's former supervisor at the San Miguel County Sheriff's Office, Lieutenant Chad Petronovich.

At the conclusion of the hearing, after discussion with counsel, I concluded that petitioner suffered a severe and permanent shoulder injury and issued a preliminary ruling from the bench resolving all categories of damages and awarding petitioner $250,000.00 for pain and suffering, as well as amounts for past and future lost wages and employee benefits including health insurance consistent with the benefit he received as an employee of the San Miguel Sheriff's Office. My decision was announced with the proviso that several items of damages, including confirmation of the worker's compensation benefits paid and calculation of the future costs of petitioner's lost employee benefits were required.

This opinion memorializes and provides further explanation for my decision including refinements of some of the initial calculations.

## II.    Discussion

### a.  Background

#### i.  Pre-Vaccination

Petitioner was described by himself, his wife, his father-in-law and his wife's aunt, all of whom traveled from the western United States to testify in person at the hearing. Petitioner studied outdoor education in college and originally came to Colorado during an internship in college, where he became an avid skier with advanced skills. Tr. 7. He moved to Vail, Colorado after college and was very active and skilled at skiing on the mountains. In the summer, he

became a serious mountain biker to stay in shape for skiing, traversing challenging single-track trails in the mountains. He worked with the local adaptive skier program, helping to guide disabled skiers down the slopes. His athletic activities enabled a substantial part of the social life enjoyed by him and his wife, Lindsay Everhart, who was also a lifelong skier. Tr. 7. Petitioner described himself as very healthy and fit and as a person who took advantage of all that the mountains offered in terms of outdoor activities including skiing, rock climbing, mountain biking and canyoneering. Tr. 6. Petitioner explained that his whole purpose for moving to Colorado was to be living in the mountains and to be active outdoors and in nature. Tr. 7.

The Everharts met in 2013 and married in 2015. They both worked in the hospitality industry but grew tired of the long hours and modest compensation. Petitioner also worked with the National Forest Service in the mornings and in hospitality in the afternoon and evenings. Eventually, petitioner decided that he wanted to try police work as a career that would enable him to make a contribution to society and would provide a stable income for him and his wife. He was offered a job in the Sheriff's Department in San Miguel County, Colorado in which the ski town of Telluride is located. They moved across Colorado from Vail to Telluride when petitioner began work in that department.

### ii. Vaccination

On November 2, 2017, petitioner received three vaccinations at the San Miguel County Health Department, as required for his job. Two were given in his right arm, and the subject TDaP vaccine was administered in his left deltoid. He initially felt something unusual about the injection, but did not accord it any significance until the following night when he awoke with severe, slashing pain in his left deltoid at the place of the injection. The pain felt like he was being stabbed repeatedly and petitioner could not get it to stop. Tr. 10. Because the closest emergency room was an hour away, petitioner and his wife elected to treat with Tylenol and sought medical care the following morning when the injury, and its relationship to the vaccination were documented. Tr. 11; Pet'r Ex. 5 at 37.

Petitioner's primary care physician, Dr. Grundy, first documented petitioner's injury and noted that he had an injury to the axillary nerve. Pet'r Ex. 5 at 26, 37. When petitioner's severe, sharp, slashing pain did not abate she referred him to a neurologist for evaluation. Petitioner saw Dr. Michael Hehhmann, M.D., a board-certified neurologist, who examined him and performed an EMG/NCS on December 11, 2022. While most of the exam was normal, he noted that there were polyphasias with only 70 to 80% recruitment in the area of the axillary nerve in the deltoid muscle indicating irritation of the axillary nerve. He recommended further observation at that time. Pet'r Ex. 3 at 5. As Dr. Provencher explained during his testimony this is an abnormal finding indicating irritation of the nerve and abnormal firing, as there should be no polyphasias in the deltoid muscle and recruitment should be 100%. Tr. 151.

In trying to address this injury petitioner has seen four orthopedists, neurologists, pain doctors, and others. The treatments he received included physical therapy, pain, nerve and sleep medications, dry needling, cupping, platelet rich plasma injections, cortisone shots and three surgeries. In his brief, petitioner detailed 160 physical therapy appointments, eight cortisone

3

injections and four PRP or platelet rich plasma injections which petitioner agreed was accurate. Tr. 19.

### b. Pain and Suffering

The Vaccine Act provides that a petitioner may recover "for actual and projected pain and suffering and emotional distress from the vaccine-related injury an award not to exceed $250,000." 42 U.S.C. § 300aa–15(a)(4). There is no mathematical formula for assigning a monetary value to a person's pain and suffering. *I.D. v. Sec'y of Health & Human Servs*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. Dec. April 19, 2013). A "continuum of injury" approach to pain and suffering damages, where the cap was reserved for the most severe injuries and lower awards were made for less severe injuries, was created with a goal "to fairly treat all petitioners." *Hocraffer v. Sec'y of Health Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). However, the Court of Federal Claims later determined that this the "continuum" approach was not "rooted in statute or precedent." *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013).

In *Graves*, the Court set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the evidence on the record, without regard to the $250,000 cap. *Id.* at 589-90 Only then as a second step, if the award would exceed $250,000, must it be reduced to that maximum. *See id.* Though not binding on special masters, the *Graves* approach has been found to be persuasive and is now the prevailing approach used. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *rev'd and remanded on other grounds*, 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum. I have also utilized the *Graves* approach in *Davis v. Sec'y of Health & Hum. Servs.* and will do so in this case as well. No. 16-276V, 2023 WL 9288112 (Fed. Cl. Spec. Mstr. 9288112 Dec. 21, 2023).

In assessing the entire record to determine damages for pain and suffering, factors to consider include "(1) the ability to understand the injury. . . (2) the degree of severity of the injury; and (3) the potential number of years the individual is subjected to the injury." *I.D.*, 2013 WL 2448125 at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

The petitioner has certainly understood and been aware of his injury since its onset. Petitioner also established that his injury is both permanent and severe. He described in great detail the severity of his pain and the fact that it continues to the present time. He described the intense and persistent pain and loss of full range of motion in his left shoulder since the onset of his SIRVA injury during his testimony. Petitioner described his pain as "excruciating. Struggling to breathe, struggling to exist. It felt like torture. I didn't know how to make it stop. And just simply excruciating pain." Tr. at 12. Petitioner testified that his pain has greatly affected his sleep, describing it as "a roller coaster" and explaining that "there have been periods where [he has] had better sleep. [He has] had periods where [he has] had better feeling, better energy through these seven years…but it hasn't been consistently good sleep, and that's been one of the hardest challenges with this." Tr. 13-14. Though not wanting to, petitioner has had to use a sleep medication to enable sleep. Mr. and Mrs. Everhart provided extensive descriptions of the pain and loss of function that the petitioner has endured over the last seven years. They described that at times he had good days when the pain was less, but often it would become worse over the course of the day. Petitioner explained that physical therapy was very difficult because of all the exercises moving the shoulder. He did return to work at the Sheriff's office after several months but eventually determined that he could not meet the job requirements. One such requirement was handling a firearm, which petitioner was unable to do due to his shoulder pain. Another requirement involved potentially dealing with unruly prisoners, as the Sheriff's office supervised the local jail in Telluride. Mrs. Everhart described that petitioner was often very depressed as a result of the pain and loss of the physical activities that he loved. He has not been able to continue skiing or mountain biking, as he did before which has been particularly hard for him given his level of involvement with those sports. Both his wife and father-in-law described his advanced skills and commitment to participation in the mountain sports before his injury.

After he left the Sheriff's office, they moved back to the Vail area nearer to Lindsay's parents. Scott was able to obtain a job as an assistant manager at the Sonnenalp Lodge in Vail. He did this for some period of time but found that often he had to help guests unload heavy luggage and ski equipment which aggravated his shoulder injury, and he had to resign. He now drives a bus for the Vail Corporation. In both jobs, he earned less than he had in the Sheriff's Office in Telluride. He is able to drive the bus around the resorts, but his shoulder becomes quite painful over the course of a day. His wife also described the stress that this injury had placed on him psychologically and on their marriage. The loss of his full-time income was a particular stressor.

When the various treatments he was pursuing were not helping and they were running low on money, Lindsay's aunt, Susan McEwen, who is a nurse practitioner and had been consulting with them on his care, invited them to her home in Whitefish, Montana hoping that she could help direct his care from there. Ms. McEwen testified that after several months of trying to find a solution for him using some of her contacts in the medical community in northern Montana, it was decided that it was best that they return to Vail and consult with surgeons at the Steadman Clinic, a well-known orthopedic practice there.

After returning to Colorado, petitioner initially consulted with shoulder surgeon, Dr. Thomas Hackett at the Steadman Clinic who performed his first surgery. In that surgery he

focused on synovitis, cleared out a lot of bursal tissue and debrided the shoulder. Tr. 117. After this surgery did not bring significant relief, Dr. Hackett recommended that Scott consult with Dr. Matthew Provencher who specialized in complex shoulder surgery at the Steadman Clinic. [2] Mr. Everhart consulted Dr. Provencher who testified that there came a time when he recommended a second surgery, but it was only after a prolonged course of physical therapy as well as some objective evidence that they were able to obtain. He ordered an MRI of the deltoid that demonstrated a defect in the front part of the deltoid muscle. He said he was concerned about an axillary nerve injury because 50% of the deltoid muscle was not working as well as the rest of the deltoid muscle and other muscles in his body. After exhausting multiple non-surgical treatment modalities over months and months without improvement, he also ordered a nerve conduction study which provided objective evidence that the axillary nerve was not working well in the front half of the deltoid. Tr. 110. Dr. Provencher explained that the axillary nerve starts in the back and comes around the deltoid and in the front branches out into three or four smaller branches, called arborizing. It was clear that one or more of those branches had been injured because the front of the muscle was completely down compared to the other side and that was causing significant problems including inflammation, weakness and overall joint dysfunction of the shoulder. Tr. 111.

Dr. Provencher further explained that the axillary nerve provides both sensory and motor innervation to the deltoid muscle and that it passes deep in the muscle. He said he had seen this type of injury from injections in the military because of the large volume of vaccinations that they give, so he recognized the connection to the vaccination. Tr. 112. He further explained that the shoulder is a ball and socket joint that is supported by the surrounding muscles which keep the shoulder movement moving in the desired pathways. But when the shoulder joint loses the proper excursion to keep the correct muscle path because of dysfunction of the muscle due to nerve injury, you then develop improper mechanics around the shoulder.  Those improper mechanics can very well lead to known conditions such as subacromial impingement, biceps tendonitis, SLAP tears, rotator cuff irritation, and even rotator cuff tears due to muscle dysfunction. He said the most important thing that we have in any joint is the muscle around it and when nerve is not working well to power the muscles you end up with orthopedic conditions like those mentioned. Tr. 113.

Dr. Provencher explained that the front part of the deltoid muscle is the most important part of the deltoid for doing what we do as human beings day to day, including reaching for a glass, reaching overhead, reaching to the front, holding a firearm as petitioner was required to do. While he agreed with the watch and wait approach of the first neurologist who documented the abnormal polyphasias in the axillary nerve several weeks after the vaccination, at this point in May of 2020, it was clear that the front part of the deltoid was not going to come back as it had been too long. Tr. 115.

---

[2] Dr. Provencher is an honors graduate of the United States Naval Academy, and Dartmouth Medical School. He completed his residency in orthopedics at the Naval Medicine Center, San Diego, and a shoulder and sports medicine fellowship at Rush Memorial in Chicago.  He served as an orthopedic surgeon in the Navy for 17 years on active duty and 10 years in the reserve.  He was director of Sports Medicine and Surgery from 2007-2013. After that he became the Chief of Sports Medicine at Massachusetts General Hospital and Harvard Medical School for four years. He then accepted an appointment at the Steadman Clinic.  He has recently been named one of the top 28 shoulder surgeons in the United States by Orthopedics Today.  He has received numerous honors for his medical work.

They determined to do a second surgery. Part of that surgery was similar to what Dr. Hackett had done in clearing out a lot of bursal tissue and debriding the area, because he explained that these conditions had come back because of the improper shoulder mechanics caused by the injury to the deltoid. Tr. 116.

On May 8, 2020, Dr. Provencher initially performed an arthroscopic subacromial bursectomy, repair of a SLAP tear and then went on to perform an open deltoidplasty. He dissected into the deltoid muscle and was then able to see the defect more clearly then could be seen through the skin. There was a defect that was about 4 cm in length. It was filled with fat and scar tissue that had infiltrated the defect. He explained that the only reason that that happens is that the muscle is not working, usually because the nerve is not working. Tr. 120. Dr. Provencher explained that this is something that should never happen in the deltoid muscle without an inciting event. In this case the inciting event was the injection that injured the nerve that powers the deltoid muscle. Tr. 119.

At that point he took out the abnormal tissue between the muscle fibers. After removing the fat and scar tissue from between the muscle fibers he then brought better muscle fibers forward and re-attached the innervated muscle fibers to the front of the acromion. He drilled small holes in the acromion and then sutured the middle portion of the muscle through these holes in order to move the middle part of the muscle that was innervated toward the front where the muscle was not. This was done in order to try to improve the deltoid muscle's mechanical advantage and function. Tr. 120.

He further explained that after this surgery extensive physical therapy is required in order to retrain the brain to enable the transferred part of the muscle to now act as the front part of the muscle which they call proprio-perception. They also used platelet rich plasma injections to try to hold down the inflammation and prevent the fat and scar from returning. Tr. 120. He said that the surgery was successful in that petitioner now has about 30-40% in the front part of the deltoid, which he did not have before.

About a year later Dr. Provencher performed a third surgery in which he did a tenotomy and tenodesis on the long head of the biceps tendon. He testified that the need for this surgery was also secondary to the original injury because of the improper mechanics of the shoulder caused by the deltoid injury which has not been fully corrected despite the prior surgery and physical therapy. He said with the front part of the deltoid not working properly the long head of the biceps becomes inflamed, gets an abnormal load and pushes up against the shoulder and a vicious cycle of inflammation repeats. So, he detached the long head of the biceps and relocated it below the pectoralis muscle on the humerus in order to take it out of the area where it is a pain generator while preserving the function of the biceps. Tr. 123.

Dr. Provencher testified that he has seen Mr. Everhart many times over the past several years with the last appointment on October 24, 2024. He said that Mr. Everhart had come a long way from the time when the injury occurred, but he still has significant problems with pain. He is limited in lifting. He testified that he thought petitioner should be limited to about four to six hours a day of work and explained that the pain he complains of at the end of a workday driving

a bus was not unexpected, as it is a cumulative problem because of the abnormal movement in the shoulder with turning the wheel or opening the door. He said he may have little or no pain in the morning but have significant pain by the end of the day because the abnormal movement in the shoulder secondary to the deltoid dysfunction causes inflammation as a result of the movements involved with working. Tr. 321.

Dr. Provencher testified that petitioner's injury is permanent, and he expects that petitioner will have to retire early – probably between the ages of 40 and 50. He said his prognosis is fair. Petitioner will continue to have problems with his shoulder on a daily basis, and will need additional treatments over time including therapy, injections, potential biologics and possibly surgery. They recommend shoulder stimulation, sometimes cold press therapy and he may need injections like he has been receiving four times a year. Tr. 137. He testified that he has referred petitioner for psychological counseling to deal with the emotional impact of this injury. Tr.131.

I asked Dr. Provencher whether petitioner would be a candidate for shoulder replacement. He said that he could be but because of the injury to the deltoid muscle and the need for strong muscle support of the implant the decision to go forward with such surgery would be very complex, and he would probably seek consultations with other expert shoulder surgeons internationally before doing that surgery. Tr. 138.

Dr. Provencher testified that it was his opinion, to a reasonable degree of medical certainty, that the vaccination caused injury to the axillary nerve, which caused the denervation of the front part of the deltoid muscle which resulted in the problems detailed above.

Petitioner also testified about the severe nature of his injury. In his testimony, he explained that most of his pain is in his left shoulder. He also explained that because of his pain and loss of function he is unable perform his job to the best of his ability. Because of the dysfunction in his left arm, he had to give up the job as a police officer, which he found fulfilling and had chosen as his career path. He has also been limited in the types of work that he can do in the hospitality industry, which is the primary industry in Vail, because most of the jobs involve lifting and carrying often heavy luggage and ski equipment. Dr. Provencher testified that petitioner should be limited to four to six hours a day of work with limited lifting or carrying because the dysfunction of the muscle causes inflammation with movement on a daily basis. He said that he may start the day with minimal pain but then go up to a seven, eight, or nine by the end of the workday. Tr. 128.

Finally, petitioner summarized the ways in which his injury has upended his life. Specifically, petitioner explained that, prior to his vaccine injury, he was a "healthy young individual who lived in the mountains and took advantage of every opportunity the mountains provide." He explained that he participated in activities such as "biking, skiing, climbing, and canyoneering" and that he "had a zest for the outdoors and adventure." Tr. at 6. He explained that his injury "encompasses [his] entire life," from sports that he "thriv[ed] in, the sports that I lived for, the physical fitness that [he] was in, the health that [he] had.] Tr. 26-27. He has clearly lost the ability to do something he once enjoyed as a result of his injury. In consideration of the approximately eight years that petitioner has experienced substantial pain, lack of sleep

8

secondary to pain, loss of function, and his inability to do the things he once enjoyed which were central to his life, along with the attendant psychological pain caused by his injury, as I announced at the conclusion of the hearing, I award petitioner $250,000.00 in past pain and suffering. Tr. 521.

### c. Past Lost Wages

The Vaccine Act provides that compensation for loss of earnings, including actual loss of earnings, should be "determined in accordance with generally recognized actuarial principles and projections." 42 U.S.C. § 300aa–15(a)(3)(A). While the Federal Circuit has not interpreted what qualifies as "generally recognized actuarial principles and projections," the Court of Federal Claims has recognized in the broader context that "the determination of compensation for lost earnings . . . would likely require expert opinion evidence." *Dillenbeck v. Sec'y of Health & Human Servs.*, 147 Fed. Cl. 131, 139 (2020).

A primary point of contention between the parties was related to the calculation of petitioner's wage base. Petitioner received the subject vaccine as a requirement of employment with San Miguel County Sheriff's Office. Prior to starting this position, petitioner's career was primarily in the hospitality industry. As the result of his SIRVA injury, petitioner had to leave his position at the Sheriff's Office and returned to the hospitality industry. Petitioner argues that the salary petitioner would have made if he continued at the Sheriff's Office is the appropriate wage base, while respondent argued that a position in the hospitality industry was the more appropriate wage base based on petitioner's past experience and college degree.

The testimony from petitioner, his wife, and Lieutenant Chad Petronovich, his supervisor at the San Miguel County Sheriff's office, strongly indicated that petitioner made a significant career choice when he elected to pursue a career in police work and was hired by the San Miguel Sheriff's office. As noted above, petitioner had expressed frustration with the hospitality industry and affirmatively sought a new career because he wanted to contribute to the community and police work offered that opportunity along with more consistent and better compensation. He and Mrs. Everhart made a significant decision to move across Colorado from Vail to Telluride to accept the position, again, indicating dedication to the career choice.

Lt. Petronovich testified that petitioner joined the Communications and Corrections Division of their office in 2017, which supervises the 32-bed jail, provides court services and handles 911 emergency dispatch services. He testified that petitioner was an excellent deputy, was very intelligent and mature, excelled in his duties, and had leadership qualities. Tr. 393. Given petitioner's excellent performance and leadership qualities, Lt. Petronovich wanted petitioner to test for promotion to Corporal in less than one year, an accomplishment that usually takes three to four years of experience. Petitioner took and passed the test and was promoted to Corporal. Tr. 393. Lt. Petronovich testified that, as a corporal, the employee is required to supervise the deputies on duty, which could be three to five deputies. Corporals manage the jail, including intake, and manage the mental and medical needs of the incarcerated people. Tr. 394-95. They require firearms training and testing, as well as arrest control and defensive tactics training. Tr. 398. Lt. Petronovich testified that when he arrived, petitioner was a very fit and athletic person who was active in skiing and other mountain activities. However, after the

vaccination injury, it was clear that petitioner was in a lot of pain. Tr. 396. It was apparent that petitioner was not getting enough sleep because of the pain which petitioner discussed with him. Lt. Petronovich testified about the need to be able to handle unpredictable situations, sometimes with dangerous, uncooperative people. He testified that, from his personal observation of petitioner, by the end, he thought that petitioner could not do the job safely for himself or others given his symptoms. Tr. 433-34. Lt. Petronovich compared petitioner's situation to being on injured reserve on a football team. Tr. 398-99. He testified that everyone at the Sherriff's Office wanted petitioner to succeed but, eventually, it was clear that he could not.

When petitioner was back to work on light duty, there was an incident with an unruly arrestee in the jail where petitioner, together with other officers, tried to control an intoxicated and uncooperative person. Lt. Petronovich was aware of the incident but did not have significant details. He knew petitioner suffered an aggravation of his shoulder injury that set back his recovery for a period of time. Considering Dr. Provencher's description of the critical component of petitioner's injury and disability being the injury to the axillary nerve and the defect in the front part of the deltoid caused by the lack of innervation in that part of the muscle, which Dr. Provencher testified could only have been caused by the injection, the incident at the jail does not appear to have had a long-term effect on his shoulder, while the vaccine injury has.

The Finance Office of San Miguel County provided a detailed description of the wage rates and likely progression of a Corporal from 2017 to 2024. Pet'r Ex. 55. The Finance Office provided the wage data for a currently employed corporal who was hired at about the same time as petitioner, which showed that that corporal was at Grade 35 Step 3 in 2019 and progressed to Grade 35 Step 8 by 2024. Lt. Petronovich testified that this was a normal progression which would have brought petitioner's salary to $76,190.40 by 2023, the last full year for which data was submitted. Lt. Petronovich said they had an annual review and, based on acceptable performance, officers typically received a step increase each year, which came with a pay increase and a cost-of-living increase. Tr. 434. Lt. Petronovich also testified that their officers typically received overtime for time worked over 160 hours a month and for work in special circumstances such as emergencies. The Finance Office report showed a consistent amount of overtime of about 165 hours per year and special overtime of 112 hours per year, which amounts to between two and three hours per week. Lt. Petronovich said that this figure was well within the realm of reason for what a Corporal would work. Tr. 414. Accordingly, by 2023 petitioner's likely earnings would have been approximately $89,378.00, as shown by the Finance Office document. *Id.* Lt. Petronovich testified that because of petitioner's intelligence and maturity that, in his opinion, petitioner's path was up and that he had the potential to become a taser instructor, a firearms instructor, or to advance to other higher positions within the Sheriff's Department.

In calculating the petitioner's past lost wages, I reviewed and accepted the total figure provided by the San Miguel County Finance Office, as validated by Lt. Petronovich which amounted to $418,750.99 from 2019 to 2023. I also reviewed the earnings the petitioner achieved in working different hospitality jobs over the 2019-2023 period, as documented by his W2s from different employers in the hospitality business in Vail Colorado. Petitioner also documented the earnings from both sources for the first quarter of 2024 with the differential amounting to $24,053 which was included in the above figure from San Miguel County. Pet'r Ex. 55. Finally, petitioner received workers' compensation benefits, as the vaccinations he

received were required by his employer. Petitioner received a total of $68,947.83 from workers' compensation, which is also offset from his past lost earnings. Petitioner provided a letter confirming the closure of his workers' compensation file, indicating that he will not receive any additional benefits.

The calculation:

| | |
|---|---:|
| Earnings from 2017 to first quarter 2024 San Miguel | $418,750.99 |
| Actual Earnings from W2s from replacement jobs | 207,529.00 |
| Workers' Compensation Offset[3] | 68,947.83 |
| **Total Past Lost Wages** | **$142,274.16** |

### d. Future Wage Loss

As discussed above, I find that petitioner would have likely continued working and advancing at the San Miguel County Sheriff's Office but for his SIRVA injury, and, thus, the pay scale from the Sheriff's Office is also the appropriate wage base to calculate future lost wages. This conclusion is based on petitioner's testimony as to his desire to pursue a career in police work and his decision to accept employment with the Sheriff's Office. It is also based on the significant commitment made by him and his wife to move across Colorado away from her family to take the position and the testimony of his former supervisor, as described above.

Petitioner presented vocational testimony from Dr. Staci Schonbrun projecting total earnings loss based on the San Miguel County earnings and full retirement at age 47.5. Respondent presented a vocational expert, Trey Mosely, opining that I should disregard the Sheriff's Office earnings and base my conclusions as to future wage loss on lower hospitality industry earnings. Dr. Schonbrun noted that Mr. Everhart had three failed work attempts in the hospitality field largely because of his physical limitations as even in an assistant manager position in a mountain resort area it was common that he had to help with unloading heavy luggage and ski equipment for hotel guests. As Dr. Provencher also noted because of the instability of the shoulder secondary to the deltoid muscle injury, Scott was frequently in pain by day's end and missed workdays to recover from shoulder pain resulting from working full days.

Dr. Schonbrun noted that the bus driving job that Mr. Everhart now has pays $25 an hour. Dr. Provencher said that he should not work more than four to six hours a day. Dr. Provencher also testified that petitioner will likely have to retire between the age of 45 and 50 and Dr. Schonbrun adopted the age of 47.5 years for full retirement from the work force. She calculated that his earnings capacity based on 20 hours per week would be $25,998 per year

Respondent's expert, Trey Mosely, concluded that Mr. Everhart would be capable of medium exertion work in the hospitality industry part time with projected earnings of about $29,000.

---

[3] As confirmed by Dr. Kennedy and the documentation from San Miguel's workers compensation carrier.

As stated above, I determined that petitioner's lost earnings should be based on his potential earnings with the San Miguel County Sheriff's Office. Though petitioner has been working full time at a lower salary than he would have earned at the Sheriff's Office, I have concluded, based on Dr. Provencher's testimony, that it is unlikely that petitioner will be able to work full time going forward due to his injury. As a result, the discrepancy in his wages going forward will be greater. He will also lose his employer-sponsored benefits including his health insurance benefits by dropping below full time.

### i. Work-life Expectancy

Petitioner introduced the testimony of economist Dr. Robert Cook to address the issues involved in the calculation of future wage loss. Dr. Cook noted that Scott Everhart was born on July 17, 1984. The date of his injury was November 2, 2017. His actuarial life expectancy at that time was 43.2 years. Work life expectancy is generally based on considerations of educational level, gender, age to Social Security eligibility and other factors. Dr. Schonbron opined that his actuarial work life expectancy at that time was 33.5 years. Dr. Cook said that, while Mr. Everhart may work to Social Security retirement age of 67, it is unlikely that he would be employed full time to that date. The actuarial work life calculations account for probable interruptions in employment prior to his normal retirement age. Thus, taking into account his age, education and employment history his actuarial work life expectancy is 31.5 years which can be accepted to a reasonable degree of economic certainty. Pet'r Ex. 54 at 5.

I agree with Dr. Cook and have adopted the work life expectancy of 31.5 years from the date of injury, or a retirement age of 64.8 which Mr. Everhart will reach in 2049.

### ii. Calculating Net Present Value of Future Wage Loss

Future wage loss for a person with a permanent disability is determined by taking a base wage rate, in this case the earnings from San Miguel County as discussed above, then calculating those earnings from the date of injury to the end of petitioner's work life expectancy. As Mr. Everhart worked or received worker's compensation in part of that period and four years income loss has been compensated as past lost wages, the future wage loss period from 2024 to 2049 is 25 years.

Dr. Cook provided two charts, the first doing the necessary calculations to project the net present value of petitioner's future wage loss and the second to show the same calculations for his likely projected income based on 20 hours a week for the remainder of his work life expectancy with the base beginning with his earnings from his present job but reducing his hours to 20 hours a week or $25,998 annually.

In Vaccine cases we are required to reduce an award for future damages to net present value. This is done by determining a likely growth rate in wages over the work life period and projecting that, in this case for 25 years, to arrive at a total wage loss incorporating the growth rate on one side of the equation. On the other the economist determines what return the petitioner could earn in a conservative investment, usually U.S. Treasury bonds, because he is receiving a

12

lump sum of money now that can be invested to compensate for losses that will occur at different times in the future. If the rate of return is greater than the projection of future growth then he applies that difference as the discount rate which is used to reduce the award to net present value. *See Petronelli v. Sec'y of Health & Hum. Servs.*, No. 12-285V, 2016 WL 3252082 (Fed. Cl. Spec. Mstr. May 12, 2016).

Dr. Cook utilized a methodology which I found to be very reasonable, conservative, and as accurate as projecting future returns can be. On the wage growth side, he applied an inflation rate of 2.4 % based on historical cost of living data. On the investment return side of the equation, he calculated the return on U.S Treasury bonds that mature in each year in the future that the petitioner's wage loss will occur. The United States Treasury sells bonds with different maturities which essentially means that the investor who buys a $1,000 bond will receive the return of that principal amount in the year of maturity together with the interest that the market set for bonds maturing in the given year. Interest rates on U.S. Treasuries are determined by the market at the time of purchase, vary from year to year with rates ranging from 3.7% in 2027 to 4.93% in 2049.[4] The rates are set at the time of purchase.

I found this methodology to be particularly reliable because it did not depend upon the opinions of experts about what the market will do in the future but reflected the value that could be earned by dividing the lump sum to be received at this time into bonds maturing in each future year of wage loss at the current rate of return for bonds maturing in the year of the wage loss. Based on that calculation, Dr. Cook reduced the future wage loss award as explained above to net present value.

In both of the charts showing his calculations, Dr. Cook determined the rate and figures for FICA taxes, U.S income taxes, and Colorado income taxes to calculate the projected net income of the petitioner for each year. He then applied the discount rate to reduce the net income figure to present value. He then computed the total net value of the first chart representing the net value of the loss of the San Miguel income and of the second chart representing his residual earnings capacity at 20 hours a week. The values in each chart were calculated to the year 2049 which is the projected retirement date.

I concluded based on the testimony that it will be necessary for Mr. Everhart to reduce in his working hours to 20 hours a week because of his injury, but I did not adopt the opinion that he would leave the work force entirely in his mid-forties. Accordingly, I took Dr. Cook's figure of total net present value of wage loss of $1,402,011.00 and subtracted the net present value of wages that he will likely earn in part time employment of $448,227.00. Pet'r Ex. 54 at 10-11 (Tables 1 and 3). The resulting calculation amounted to a net future loss of $953,284.00.

Respondent requested his expert, Dr. Patrick Kennedy to review Dr. Cook's calculations after the hearing was complete and Dr. Kennedy reported that he had no disagreement with Dr. Cook's future wage loss analysis. Dr. Kennedy did review the documentation for workers compensation paid and determined that the total submitted during trial of approximately $49,000 was not accurate and that the accurate total figure was $68.947.83, as there was an additional

---

[4] The rate for 2025 and 2026 was actually slightly higher than for 2027 which was the year in which the lowest rate was quoted.

period of compensation that the carrier did not include in documentation sent to the petitioner's counsel and filed as Ex. 48. This accurate figure was applied in calculating past wage loss as detailed above.

### iii.  **Lost Employee Health Benefits**

I also find that a significant part of the petitioner's lost compensation was the employer paid health insurance that was provided as part of his compensation, and which covered the petitioner and his wife when he was employed in the Sheriff's Office. San Miguel County provided the current cost breakdown for the plan, which was substantially employer paid with some contribution from the employee. The cost for 2025 was $23.019.60. Pet'r Ex. 75. As with any issue involving costs in the health care system, I recognized that the estimation of the future cost of health insurance presented a separate challenge. Accordingly, I directed both experts to provide their estimate of the future rate of inflation in health insurance premiums for employer-paid plans.

Initially, Dr. Cook proposed an inflation rate of 6% based on prior CPI for health insurance. Dr. Kennedy proposed a rate of 1.83% which he said was based upon the Bureau of Labor Statistics estimates. As this latter number seemed to be at least intuitively unlikely, I reviewed the BLS methodology for estimating health insurance costs. The BLS, in order to compensate for some large swings in health care utilization that had occurred during and immediately after the pandemic, used a method called the retained earnings method. Essentially the BLS collected data on what health insurers paid for covered medical costs in a year along with administrative costs and then calculated the retained earnings of the insurance companies. I was not able to find the 1.83% number at the BLS website and no citation for same was provided.

This methodology did not appear to adequately address the central question to be resolved in this case which is how to determine the net present value of the employer-paid portion of the benefit package that petitioner would have received had he remained employed by San Miguel County until the end of his work-life expectancy in 2049. Accordingly, I directed that both experts provide the court with a report detailing the methodology they used to come to their estimates of the future value of this benefits package reduced to net present value.

As the benefits package was almost entirely composed of health insurance benefits, the economists used the cost of health insurance to project the value of the lost benefits package. Dr. Cook filed a report in which he indicated correctly that estimating future costs for health insurance was complicated because of different estimates used by government agencies and private firms. He informed the court that petitioner's counsel advised him that, in the Vaccine Program, future costs for health insurance were generally set at 2% above the rate of inflation. While I recognize that some stipulations or proffers have been set at numbers generally resembling that method, I did not consider that this answer addressed the question of methodology that was asked. He offered a compromise by applying a 6% rate through 2030 and 4% thereafter.

Somewhat to my surprise, after his initial response, Dr. Kennedy provided an excellent report addressing the question that I asked and recommended a 4.6% rate of inflation to be applied to determine the future value of the plan. As I found the explanation that he provided to be comprehensive and ultimately came to what appears to be a reasonable estimate for future health insurance costs based on multiple sources of data, I am adopting his estimate and calculation in full.

Dr. Kennedy agreed that the retained earnings methodology of the BLS was not particularly helpful in addressing the issue of the cost of replacing the employer paid plan for an individual petitioner. He observed that the BLS also provided an estimate of future health insurance costs through the Producer Price Index (PPI) that did directly measure the insurance premiums received by insurers. However, this estimate was also adjusted for returns earned by insurers on the premiums received, reducing its utility for purposes of estimating premium costs.

He then reported on the Kaiser Family Foundation Survey which is based on interviews with business owners and benefits managers at 2,142 firms. He then compared the KFF data with data from the Medical Expenditures Panel Survey-Insurance Component, (MEPS-IC) also called the Health Insurance Cost Study which is an annual study conducted by the Census Bureau for the Agency for Health Care Research and Quality in the Department of Health and Human Services. As Dr. Kennedy explained it:

> MEPS-IC collects statistically representative data on an annual basis. MEPS-IC includes information on the number and types of private health insurance plans offered, benefits associated with these plans, annual premiums and contributions to premiums by employers and employees, copayments and coinsurance. MEPS-IC therefore collects and reports data that is directly relevant to what is being measured. MEPS-IC is an annual national sample of approximately 40,000 private industry establishments and 3000 state and local governments.[5]

Resp't Ex. E at 3.

Because the MEPS-IC data was drawn annually from a much larger sample of employers than the KFF data, Dr. Kennedy placed greater weight on that data.[6] Nevertheless, when he compared the data from both sources over ten- and twenty-year time frames the difference was not substantially different.

As the benefit that was provided to petitioner as part of his employee compensation covered both him and his wife, I review the data provided for family plans as opposed to an individual plan. Dr. Kennedy compared the annual growth rates in health insurance costs over the last ten years and 20 years. The Kaiser Family Foundation found a growth rate of 3.67% over 10 years and 4.671% over 20 years. The MEPS-IC annual growth data showed annual increases of 4.09% over ten years and 4.87% over twenty years. Dr. Kennedy then explained that public policy changes over many years have affected the costs of health insurance and that these

---

[5] Htps://www.ahrq.gov/programs-survey/meps/about.html  as quoted in Dr. Kennedy's report Res Ex E pg 3
[6] Dr. Kennedy also briefly reviewed the BLS CPI report and the BLS PPI report but found the data provided by MEPS-IC and KFF to be the most useful.

changes are unpredictable. These included, at different times, the passage of Medicare and Medicaid, various supply side controls, managed care and more recently the Affordable Care Act which has had the effect of moderating health insurance costs over the last ten years. He argued that the most prudent method for projecting future health care costs is to use a longer time period to essentially smooth the effects of unforeseen changes that affect the costs of such insurance. Accordingly, he opined that using the 20-year MEPS-IC data set provided the most reliable data base for estimating future costs. I agree.

Dr. Kennedy then looked at Consumer Price Index data to see to what extent the MEPS-IC data exceeded the CPI. The MEPS-IC data indicated that the cost of health insurance exceeded the rate of inflation by 1.37% over the 10-year period of 2013-2023 and by 2.32% over the 20-year period of 2003-2023. The Federal Reserve projects that long term growth in the CPI will approximate 2.25%. Dr. Kennedy opined that it is reasonable to add 2.32% to the CPI which gives a rate of 4.57% which he rounded to 4.6%.

I found that Dr. Kennedy's report thoroughly explained the complexity involved in estimating future health insurance costs and provided a methodology that explained the basis for his opinion that was reasonable and fair to both parties. Accordingly, I have accepted his estimate of 4.6% for future growth in the family insurance plan that was provided as an employee benefit to Mr. Everhart when he was employed in the Sheriff's Department of San Miguel County. Dr. Kennedy then did the appropriate calculations to estimate present value using the 4.6% growth rate and the petitioner's expert's discount rate. The initial annual cost based on the figures from San Miguel County was $23,019.00 with an employee cost share adjustment of 12.46%. The time period for the benefit payment will end in 2049, when petitioner will reach retirement age and be eligible for Medicare. The total value of the employer-paid portion of this part of Mr. Everhart's compensation, reduced to net present value, based on Dr. Kennedy's calculations is $479,269.00. Dr. Cook estimated a total cost of $546,533.00 for the same benefit based on the methodology suggested by petitioner's counsel. I found Dr. Kennedy's estimate and methodology to be well explained and well supported and I adopt his calculations in full. Therefore, I award $479,269.00 to replace the employer-paid portion of the benefit petitioner had when working for San Miguel County.

### III.        Post Hearing Motions by Respondent

After the hearing on damages concluded, respondent's counsel raised several issues. He asked to be allowed to file an economist report in 30 days addressing future wage loss. I denied this request, as petitioner's report had been filed October 31, 2024, and respondent had adequate opportunity to reply prior to the hearing. Nevertheless, Dr. Kennedy did file a report in which he agreed with Dr. Cook's analysis as to future wage loss. He also noted a discrepancy in the workers' compensation payment based on the filing from the workers' compensation carrier. That issue was addressed, and Dr. Kennedy's figure accepted.

Respondent also asked for leave to retain a neurologist to review the case post-trial. He argued that the petitioner, in his testimony mentioned pain in other parts of his body such as his legs and that he may have complex regional pain syndrome. This was a conceded shoulder injury case, and there was no medical evidence introduced to support any claim beside the shoulder

injury. As such, I assured counsel that I had given no consideration whatsoever to conditions outside of the shoulder in reaching my decision. Accordingly, I denied the motion to have a neurologist review the case post-trial.

### IV.     Conclusion

Based on the record as a whole, the testimony heard at the January 22 and 23, 2025 hearing, and the calculations of the parties' economists I award petitioner a lump sum payment of **$1,824,827.16 to be paid through ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement to petitioner. This award represents the below amounts.**

| | |
|---|---:|
| Past Pain and Suffering | $250,000.00 |
| Past Wage Loss | 142,274.16 |
| Future Wage Loss | 953,284.00 |
| Future Health Care Benefits | 479,269.00 |
| **TOTAL** | **$1,824,827.16** |

**This amount represents compensation for all damages available under § 300aa-15(a).**

**The Clerk of Court is directed to ENTER JUDGMENT in accordance with this decision.** [7]

**IT IS SO ORDERED.**

**s/ Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[7] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review. Vaccine Rule 11(a).